IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


SHARI L. REBROOK,

                    Plaintiff,

          v.                                    Civil Action No.5:07-CV-39


MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    Background

          Plaintiff, Shari L. Rebrook, (Claimant), filed her Complaint on March 12, 2007 seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3) of an adverse decision by

Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer

on May 31, 2007.[2]  Claimant filed her Motion for Summary Judgment on June 29, 2007.[3]

Commissioner filed his Motion for Summary Judgment on September 28, 2007.[4]  Claimant filed

her response to the Commissioner's Motion on October 12, 2007.[5]

B.    The Pleadings

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 9.

[4] Docket No. 16.

[5] Docket No. 17.

1.      Plaintiff's Brief  In Support of Motion for Summary Judgment

2.      Defendant's Memorandum In Support of His Motion For Summary Judgment

3.      Plaintiff's Response to Defendant's Motion for Summary Judgement.

C.      Recommendation

I recommend that:

1.      Claimant's Motion for Summary Judgment be GRANTED because the Court cannot determine whether the ALJ employed the proper legal standard during step three of the analysis.  Additionally, the Court finds the ALJ's reasons for rejecting Ms. Allmans', Dr. McClure's, and Dr. Alghadban's opinions are not supported by substantial evidence.  Finally, the Court finds the ALJ's reasons for discrediting the severity and frequency of Claimant's seizures are not supported by substantial evidence.

2.      Commissioner's Motion for Summary Judgment be DENIED for the same reasons stated above.

## II.  Facts

A.      Procedural History

 Claimant filed an application for Disability Insurance Benefits on August 30, 2004, alleging disability since August 30, 2003 stemming from seizures, the residual effects of her seizures, and nerves (anxiety and depression).  Her application was initially denied on February 22, 2005 and upon reconsideration on December 22, 2005.  Claimant requested a hearing before an Administrative Law Judge, ["ALJ"], and received a hearing on April 19, 2006.  On June 26, 2006, the ALJ issued a decision adverse to Claimant.  Claimant requested review by the Appeal Council and submitted additional evidence in support of her appeal.  The Appeals Council

denied review and Claimant filed this action, which proceeded as set forth above.

B.     Personal History

Claimant was 39-years-old on the date of the April 19, 2006 hearing before the ALJ.

Claimant completed high school and cosmetology school and has prior work experience as a hair

stylist.

C.     Medical History

The following medical history is relevant to the time period during which the ALJ

concluded Claimant was not under a disability: August 30, 2003 through April 19, 2006.

**Dr. Navada, M.D., 5/3/04 (Tr. 151)**
Neurology: Mental status: She was alert and oriented in all spheres.  Attention, concentration, language function, fund of knowledge and memory were normal.
Impressions: 1) Spells. 2) Seizures. 3) Depression.
Discussion:
1) Shari's neurologic exam is essentially normal.  The spell she had in 1999 is suggestive of a seizure, although initially it may have been triggered by some degree of orthostatis.  She, however, reportedly had a seizure that lasted for 5 or possibly 10 minutes.
2) About six weeks back, she had a couple of episodes of hand jerking.  She's also had some episodic spells of unclear etiology.
3) As she is already on Neurontin, I feel that it's reasonable to increase the maintenance dose to 1,800 mg a day.  I've suggested that she take the bulk of the medication at night.  She has trouble sleeping and hopefully, this should help her.  I've suggested that she take 300 mg in the morning, 300 mg in the afternoon and 1,200 mg at night.
4) An EEG will be performed.
5) Some of her cognitive problems may be from the effects of other centrally acting medications including Effexor and Lorazepam.
6) Various aspects of management were discussed at length with her. I have discussed with her state regulations regarding driving in patients with possible seizures.
7) Some other newer anticonvulsants with less cognitive effects could be considered.  However, for financial reasons it may be difficult to switch her over.
8) Also, should she continue to have further spells, perhaps the input of Dr. Pawar could be obtained.  She has seen her in the past and has investigated her with EEG's, etc.
9) She will call me back on the EEG.

**Dr. Palada, 6/28/04, (Tr. 154)**
Discharge diagnosis: Atypical seizures.

**John F. Brick, M.D., 6/24/04, (Tr. 156)**
Report: This was an extended EEG that was carried out with simultaneous video monitoring on the last day of the patient's admission. Background rhythms of 11 Hz are seen. No specific epileptiform activity was present. The patient experienced no seizures.

**John F. Brick, M.D., 6/24/04, (Tr. 157)**
Clinical Interpretation: The baseline record is normal.

**John F. Brick, M.D., 6/24/04, (Tr. 158)**
Clinical Interpretation: the 24 hour video EEG is unremarkable.

**DDS Physician,, 2/26/05, (Tr. 164)**
Physical Residual Functional Capacity Assessment
Exertional Limitations: None established
Postural Limitations
      Climbing ramp/stairs: frequently
      Climbing ladder/rope/scaffolds: Never
Manipulative Limitations: None established
Visual Limitations: None established
Communicative Limitations: None established
Environmental Limitations: Hazards - avoid concentrated exposure.
Symptoms: The claimant reports that she is able to do things around the house but usually has help in the event that she has a seizure. She does not drive due to this. She is currently working one day per week as a hairdresser. Under treatment with meds and under fairly good control. ADL's limited by seizure such as driving. Non-severe with light/hazards restrictions.

**United Hospital Center, 3/29/05, (Tr. 180)**
Interpretation: Normal awake electroencephalagram.

**United Hospital Center, 3/28/05, (Tr. 182)**
Impression unremarkable unenhanced head CT.

**Dr. McClure, M.D., 4/6/05, (Tr. 195)**
Diagnosis:
Axis I: MDE, PAML
Axis III: seizure disorder
Axis IV: 3/6
Axis V:75/75
**Peggy Allman, M.A., 9/30/07, (Tr. 197)**
Diagnostic Impressions:
Axis I: 293.83 Mood disorder due to seizures

Axis II: 300.01 Panic Disorders without Agoraphobia
Axis III: 293. 84 Anxiety Disorder due to seizures
Axis IV:V71.09 No diagnosis
Axis V: Seizure disorder as reported by the claimant.

<u>Diagnostic Rationale</u>: The claimant was mildly anxious during the evaluation and had broad affect. She was cooperative and pleasant. She reports that since her first seizure in 1999, she has progressively become more depressed and anxious, including the developments of panic disorder. She is uncomfortable around crowds because she is afraid she is going to have a seizure. She worries excessively, feels anxious often and indicates that this worrying and anxiety interfere with her functioning on a regular basis. Both the Mood Disorder and the Anxiety Disorder appear to be directly connected to the advent of seizure disorder and concomitant restrictions. She reports difficulty with sleep, crying easily, low energy, feeling down and occasionally suicidal ideation.

<u>Prognosis</u>: Good

<u>Social Functioning</u>: Her social interactions with the examiner was within normal limits. She reports that she has a lot of social interactions with her family and enjoys watching TV and attending Church.

<u>Concentration</u>: Is measured by Serial Sevens was severely deficient.

<u>Persistence and Pace</u>: Were both within normal limits.

<u>Immediate memory</u>: Was mildly deficient and recent memory was within normal limits.


**<u>Philip E. Comer, Ph.D., DDS Physician, 11/10/05, (Tr. 200)</u>**

<u>Psychiatric Review Technique</u>

Medical Dispositions: RFC Assessment Necessary

Category(ies) Upon Which the Medical Disposition is Based: 12.04 Affective Disorders; 12.06 Anxiety-Related Disorders.

Affective Disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Mood disorder due to seizures.

Anxiety-Related Disorders: Anxiety as the predominant disturbance or anxiety experience in the attempt to master symptoms as evidenced by at least one of the following: Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week. Without agoraphobia.

A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Anxiety Disorder due to seizures.

Rating of Functional Limitations

Restriction of Activities of Daily Living: Mild

Difficulties in Maintaining Social Functioning: Moderate

Difficulties in Maintaining Concentration, Persistence or Pace: Moderate

Episodes of Decompensation, each of extended duration: None

"C" Criteria of the Listings: Evidence does not establish the presence of the "C" criteria.

Consultant's Notes: Claimant's dual and interacting diagnoses are serious but do not meet or equal listings. However, two moderate limitations B Criteria rating (#s 2,3), call for a RFC Assessment. Claimant appears to be functioning better with treatments and medications. Her statements are credible from her perspective. (See RFC).

**Philip E. Comer, Ph.D. DDS Physician, 11/11/05, (Tr. 214)**
Mental RFC Assessment
Understanding and Memory:
> Ability to remember locations and work-like procedure: not significantly limited
> Ability to understand and remember very short and simple instructions: not significantly limited
> Ability to understand and remember detailed instructions: moderately limited

Sustained concentration and persistence
> Ability to carry out very short and simple instructions: not significantly limited
> Ability to carry out detailed instructions: moderately limited
> Ability to maintain attention and concentration for extended periods: moderately limited
> Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: not significantly limited
> Ability to sustain an ordinary routine without special supervision: not significantly limited
> Ability to work in coordination with or proximity to others without being distracted by them: not significantly limited
> Ability to make simple work-related decisions: not significantly limited
> Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.

Social Interaction
> Ability to interact appropriately with the general public: not significantly limited
> Ability to ask simple questions or request assistance: not significantly limited
> Ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited
> Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: not significantly limited
> Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

Adaptation
> Ability to respond appropriately to changes in the work setting: moderately limited
> Ability to be aware of normal hazards and to take appropriate precautions: not significantly limited
> Ability to travel in unfamiliar places or use public transportation: not significantly limited

Ability to set realistic goals or make plans independently of others: not significantly
limited

Functional Capacity Assessment: Claimant's functional capacity limitations do not exceed
moderate and do not call for a RFC assessment. Claimant has the mental/emotional capacity for
routine repetitive activity, in a low stress supportive work environment and that can
accommodate her physical limitations.

**DDS Physician, 12/20/05, (Tr. 218)**
Physical RFC Assessment
Exertional Limitations: None established
Postural Limitations
        Climbing ramp/stairs: frequently
        Climbing ladder/rope/scaffolds: Never
Manipulative Limitations: None established
Visual Limitations: None established
Communicative Limitations: None established
Environmental Limitations: Hazards - avoid all exposure (seizure disorder)
Symptoms: Claimant with history of epilepsy. Last neurology note from Dr. Alghadban is from
July 2005 states that he has a combination of seizure and pseudoseizures.
Additional comments: Follow up note from Dr. Algadban from December 8, 2005 seen claimant
with seizure disorder, she should avoid unprotected climbing, heights and hazards.

**Dr. Adnan Alghadban, M.D., 2/10/06, (Tr. 226)**
In my professional opinion, I think the patient cannot handle work at this time, given her seizure
and depression condition.

**Dr. Adnan Alghadban, M.D., 12/8/05, (Tr. 227)**
Her examination today showed normal mental status, cranial nerves, motor strength, reflexes,
coordination and gait.
Plan: I'm planning to continue on the current medications. I think once the stress resolves her
seizures will improve. I will see the patient for follow up in 3 months for follow up.

**Dr. Adnan Alghadban, M.D., 7/26/05, (Tr. 228)**
Description: this is a digitally acquired EEG. The background frequency was a mix of alpha and
beta range. It was symmetrical bilaterally, and more prominent in the posterior leads.
Hyperventilation and photic stimulation both were performed and none of them elicit any
abnormal activity. EKG monitoring during the EEG tracing did not show any significant
arrhythmias.
Conclusion: Normal awake EEG.

**Dr. Adnan Alghadban, M.D., 7/14/05, (Tr. 229)**

Examination showed normal strength, reflexes, and coordination.

**Dr. Adnan Alghadban, M.D., 6/30/05, (Tr. 230)**
Examination showed normal strength reflexes and coordination.

**Dr. Adnan Alghadban, M.D., 4/14/05, (Tr. 231)**
Examination showed normal strength reflexes and coordination.

**Dr. Simon McClure, M.D., 2/16/06, (Tr. 236)**
I am treating Mrs. Rebrook for her major depression and panic disorder. Despite compliance with treatment she still suffers from poor concentration, poor energy, emotional lability, and agoraphobia, which will prevent her from seeking out or reliably maintaining gainful competitive employment in the community for the next 18-24 months.

**Dr. Adnan Alghadban, M.D., 3/17/06, (Tr. 241)**
Description: This is a digitally acquired EEG. The background frequency was predominantly in beta range. It was symmetrical bilaterally more prominent in the posterior leads. Photic stimulation and hyperventilation both were performed and none of them elicit any abnormal activity. EKG monitoring during this recording did not show any significant arryhthmias.
Conclusion: Normal awake EEG.

**Dr. Adnan Alghadban, M.D., 2/10/06, (Tr. 242)**
Her examination today showed normal mental status, cranial nerves, reflexes, coordination, and gait.

**Dr. Adnan Alghadban, M.D., 12/16/05, (Tr. 244)**
Summary: nerve conduction studies: Right ulnar and median motor and sensory responses were normal. Right sural and superficial peroneal sensory responses. Needle examination of selected right upper and lower extremity muscles were normal.
Impression: This is a normal study. There is not electro physiological evidence of neuropathy or myopathy in this patient.

**Dr. Simon McClure, 3/9/06, (Tr. 247)**
Diagnosis: 296.26 - major depressive disorder in full remission

**Dr. Simon McClure, 2/8/06, (Tr. 248)**
Had a seizure last week.
Diagnosis: 296.26 - major depressive disorder in full remission

**Dr. Simon McClure, 1/11/06, (Tr. 249)**
Diagnosis: 296.26 - major depressive disorder in full remission

**Dr. Simon McClure, 12/12/05, (Tr. 251)**
Diagnosis: 296.26 - major depressive disorder in full remission; panic.

**Dr. Simon McClure, 9/8/05, (Tr. 253)**
Diagnosis: 296.26 - major depressive disorder in full remission; panic

**Dr. Simon McClure, 6/11/05, (Tr. 254)**
Diagnosis: 296.26 - major depressive disorder in full remission; panic.

**United Hospital Center Emergency Department, 3/28/05, (Tr. 259)**
In the emergency department the patient is evaluated with laboratory studies, computed
tomography of the head, electrocardiogram, pulse oximetry monitoring, and oxygen 2 liters via
nasal cannula. All studies were essentially normal. The patient has also a normal computed
tomography of the head.

**United Hospital Center, 3/23/04, (Tr. 260)**
Impression: Unremarkable computed tomography head.

**Dr. Adnan Alghadban, M.D., United Hospital Center, 3/28/05, (Tr. 261)**
Differential Diagnosis: The patient most likely has anxiety attacks, causing her symptoms.
Conversion disorder also is a possibility. The patient will continue taking Neurontin 600
milligram 3 x a day for seizures. I will switch her Ativan to Xanax .05 milligram twice a day.
Also I would like to start her on Lexapro 10 milligram a day. The patient used to be on Effexor
before. She stopped taking it for about a year, but she was restarted taking it about a week ago. I
think Lexapro would be a better choice, since it has better effect on her anxiety. I will get an
electroencephalogram in the morning. I don't think there is any further imaging at this time
needed since the patient had a computed tomography scan today and had a magnetic resonance
imaging before in Morgantown. The patient will be followed up by Dr. Pawar in Morgantown
after her discharge.

**Dr. William G. Bowles, M.D., United Hospital Center, 3/29/05, (Tr. 263)**
Neurologic: The neurologic examination appears to be grossly intact. No sensory or motor
deficits noted.
Assessment and plan: 1) Unresponsive episode. 2) Depression. 3) Anxiety.

**Dr. Simon McClure, M.D., 10/16/06, (Tr. 278)**
Mental RFC Assessment
Understanding and Memory:

Ability to remember locations and work-like procedure: not significantly limited
Ability to understand and remember very short and simple instructions: moderately limited
Ability to understand and remember detailed instructions: markedly limited

Sustained concentration and persistence
Ability to carry out very short and simple instructions: not significantly limited
Ability to carry out detailed instructions: markedly limited
Ability to maintain attention and concentration for extended periods: markedly limited
Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: markedly limited
Ability to sustain an ordinary routine without special supervision: moderately limited
Ability to work in coordination with or proximity to others without being distracted by them: moderately limited
Ability to make simple work-related decisions: moderately limited
Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: markedly limited.

Social Interaction
Ability to interact appropriately with the general public: not significantly limited
Ability to ask simple questions or request assistance: not significantly limited
Ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited
Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: moderately limited
Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: moderately limited

Adaptation
Ability to respond appropriately to changes in the work setting: moderately limited
Ability to be aware of normal hazards and to take appropriate precautions: moderately limited
Ability to travel in unfamiliar places or use public transportation: moderately limited
Ability to set realistic goals or make plans independently of others: not significantly limited

**Dr. Simon McClure, 10/16/06, (Tr. 282)**
Psychiatric Review Technique
Category(ies) Upon Which the Medical Disposition is Based: 12.04 Affective Disorders; 12.06 Anxiety-Related Disorders.
Affective Disorders: Disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following:
Depressive syndrome characterized by at least four of the following:
Anhedonia or pervasive loss of interest in almost all activities, or

Sleep disturbances, or
Psychomotor agitation or retardation, or
Decreased energy, or
Feelings of guilty or worthlessness, or
Difficulty concentrating or thinking.

Anxiety-Related Disorders:
Anxiety as the predominant disturbance or anxiety experience in the attempt to master symptoms as evidenced by at least one of the following:
Generalized persistent anxiety accompanied by three of the following: motor tension, apprehensive expectation, or vigilance and scanning.
Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week.

Rating of Functional Limitations, re 12.04 and 12.06.
Restriction of Activities of Daily Living: Marked
Difficulties in Maintaining Social Functioning: Marked
Difficulties in Maintaining Concentration, Persistence or Pace: Marked
Episodes of Decompensation, each of extended duration: None

"C" Criteria of the Listings: Medically documented history of a chronic organic mental (12.02), schizophrenic (12.03), or affective (12.04) disorder of at least 2 years duration that has caused more than minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.

D.     Testimonial Evidence

Testimony was taken at the April 19, 2006 hearing. The following portions of the testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 300)

Q     Okay. And do you live with anybody else there?

A     My daughter, Alexis, she's 13, and then I have a daughter that's in college that comes in.

Q     Okay. But nobody else lives there?

11

A        No.  Me and my husband are currently separated.

Q        Is, does he live, does he still live in the area?

A        He lives with his mother.

*                    *                    *

Q        And how far'd you go in school?

A        To the twelfth grade, and then I went to cosmetology school.

Q        Did you, you finished high school?

A        Yes.

Q        Ever have any other vocational training other than cosmetology?

A        No sir.

*                    *                    *

Q        Now, as I understand it, you're still working as a cosmetologist part-time?

A        Yes. I work one day a week.

Q        And where is that at?

A        Creations Salon on Lodgeville [phonetic] Road in Bridgeport.

Q        And how many hours a week do you work?

A        It varies.  Like yesterday, I went into work and worked an hour.  The most I work
is three to four.

Q        So anywhere from one hour to four hours?

A        Yes, sir.

Q        In the entire week.  Do you get paid hourly or by the client or - -

A        By the client.

Q      Okay.  And what do you do for the client?

A      Hair cuts, coloring, perming.

Q      Did you try to work more than four hours a week in the last couple years or so?

A      Yeah.  When, originally, I was working three days a week, and with the increase in seizures, I've just had to cut back.  And sometimes, I'm unable to go in on the one day a week.  And then I have to reschedule clients, and I've lost a lot of clientele because I've had seizures in the workplace.

Q      How often does that happen?

A      That's happened on a number occasions.  One time, my boss had to call 911.  Another time, another hairdresser was there.  They, you know, got me laid down.  And you know, this happens all in front of people, clients, and you know, they've had to, like my one customer had drove from Buckhannon and had to turn around and, you know, drive back home because my parents had to come pick me up from work.

\*          \*          \*

Q      Okay.  Now, why haven't you been able to work full-time for the last two, three, four years?

A      Depression, severe depression, anxiety, the seizures, the frequency, and I'm real sensitive to the seizure medication.  I'm on my sixth seizure medication, and I have to go visit my doctor in a couple weeks, and it doesn't seem to be working either.  I had a seizure last night at 9:15.

Q      How often do you have seizures?

A      It varies.  There's really no rhyme or reason.  I'm, you're 50 percent more likely

to have a seizure when you're on your menstrual cycle or ovulating, my neurologist said, and they happen, well I have like focal seizures daily, and then I have sometimes the partial clonic where I'm not totally out, like I can hear my family asking me, are you okay, but like I can't respond back to them. That's, then I'm real just kind of hazy when I come out of it. And then the grand mal, I have those and, you know, of course, I don't recall anything. And like I - -

Q       How often do the grand mal seizures occur?

A       Well, last night, my daughter way staying all night with a friend, and the mother called, and she told me that I didn't sound right on the phone, and she hung up. She lived a few blocks away and came up there, and was there for a just a few seconds, and I had a grand mal seizure. And, you know, sometimes I have a loss of bladder control, but I always have a aura usually when it's going to happen, like tunnel vision, a feeling of nausea, dread. I have fallen, you know, on my floor, hit my head on, with an oak floor. I have fallen in the hallway, you know, it's just came on so quick.

Q       How often do you have grand mal seizures?

A       Grand mal, probably one to two times a month. The partial - -

Q       And how long do they last?

A       I'm really not sure. It, my family says it seems like forever when it's going on, but you know, I don't think it lasts that long. Then it's when I come out of it, I'm just real dazed and confused, body aches where my muscles tighten, and headache, and fatigued.

Q       How long does that last?

A       That will, like where I had the one last night, like I'm having my, the muscles in my neck and arms and legs feel weak and tired today, and I woke up with headache.

Q       Now, what are the partial seizures like?  How often do they occur?

A       They occur more often.  Weekly.

Q       And what happens during them, then you say you can hear your family, but can't respond?

A       Yeah.  It's like for a section of time, like I will be kind of totally out of it, but then like I can hear them asking me, are you okay.  But it's like I can't get the words out to say anything to them.

Q       How long do those last?

A       Anywhere from five, ten, 15 minutes of the disoriented, you know, like once I am, and I am able to speak back to them, I'm just still disoriented.

Q       What do you mean disoriented?  Once you're able to speak to them, you're still disoriented.

A       Like my head feels still like foggy.  Just, it's hard to explain.  It's just a - -

Q       How long does that last after the seizure?

A       I'd say even when I'm able to speak and actually get up and walk, maybe a half hour, I will just feel kind of strange.

Q       Now, what do you mean by a, what's a focal seizure?

A       That's staring and my family will catch me just in a blank stare, and you know, be like, Mom, Mom, and I won't respond.  And my neurologist said that's focal seizures, so I have multiple, you know, different types of seizures.

Q       How long do the focal seizures last?

A       That would  probably be under a minute, because they might say my name or

nudge me, and then finally, you know, I'll like look and be like, what'd you say, you know. They will have been talking to me and  - -

Q        And how often do these occur?

A        Focal seizures, those occur probably, almost daily.

Q        Okay.  Any problem after the seizure is over?

A        No.  Not with the focal.  They'll say sometimes I might make a funny mouth movement with the focal seizure.

Q        Anything make these, anything make any of these seizures worse or make them come on or make them more frequent?

A        Well, like I said, around the time of ovulation, menstruation, just the everyday stress, knowing that I can't be out in the work force like I was at one time.  I've been so sensitive to medication, all the medications that they've stuck me on, and they haven't seemed to work. And it's caused me to have, start having high anxiety and panic attacks when I'm in places, because I, like I was in the vision center at Wal-Mart, and had a grand mal seizure right while my husband was getting his glasses, and I ended up, when I came to, they had me in an eye examination chair.  And, you know, it's embarrassing, and you feel humiliated, and like when it's happened at work, and so  it's like, unless someone's with me, I feel nervous, you know, like if I'm in Wal-Mart and someone's not right with me, if something would happen.

Q        Uh-huh.  What medicine are you taking now for the seizures?

A        I'm not sure if I'm pronouncing it right, but it's L-Y-R-I-C-A, Lyrica.

Q        Lyrica, yeah.

A        I had taken Neurontin, and he said this was a more purified form, but I think

they're going to have to increase the dosage.

Q        And so this is still not controlling the seizures?

A        No, not, when I had the first one in 1999, I was in Savannah, Georgia, and they took me to Savannah Memorial Hospital and did a CAT scan and could see, you know, that I had had a grand mal seizure.  And I've been taking medicine since '99, and nothing has seemed to get them under control.  Like the old, they say the old tried and true, like phenobarb, Dilantin, I can't take either one.

                    *              *              *

Q        Uh-huh.  Did, do you have a driver's license?

A        Yes, I have a driver's license, but I'm not currently driving.  I only drive when I have permission from my neurologist, if I've been, you know, seizure-free, or my parents take me most places I need to go.

Q        When you say you drive with permission from your neurologist, what do you mean?

A        If he has given me permission to drive, then I drive, but if not, I don't you know, drive.  My parents - -

Q        Is, has your neurologist notified the Department of Motor Vehicles about your seizures?

A        That, I don't know.

Q        Okay.  Have they suggested any other treatment or surgery or anything for your seizures?

A        Just trying medications.  They haven't suggested surgery.  Now, Dr. McClure had

suggested some type of shock therapy, because of the depression, the severe depression and anxiety, but that kind of scared me.

\*                      \*                      \*

Q        Do you still volunteer at the Humane Society?

A        Not, I used to go like every Sunday, because my sister-in-law would drive me. Well, now, she has three children, and I do when, if my Dad'll take me or one of my brothers, because I really enjoy, you know, working with the abused animals and fostering animals and - -

Q        How often do you actually wind up going there on like a Sunday or other day?

A        Well, I haven't been there for months now, for probably three months, but before, I would average probably two times a month on Sunday.

Q        Anything make your depression or anxiety worse, or cause you to get more upset?

A        Yeah, the, just because I used to, you know, be able to hold down a full-time job and work, and even, because this is my second marriage, and take care of me and my first daughter, and you, people just don't realize when you don't have your health, that keeps you, hinders you from being able to do the things you once used to do, you know, how, what, it just causes you such depression, humiliation, you know, like when I've come in to the work place having a seizure and paramedics there, and customers seeing, and being in Wal-Mart, and it just makes you just want to stay home.  And you know, I feel nervous in large crowds.  I just kind of feel safe, you know, at my house, because my parents only live a couple blocks away, and I know that I can call on them anytime I need to.

\*                      \*                      \*

CLMT        Oh, okay, then it must have been, that's another problem I have is memory

18

problems.

Q       Now, why did you go to the hospital?

A       I was, I didn't know what it was, but I was passing out, passing out.  I mean, they couldn't keep me conscious.  They thought it was seizures, and it turned out to be all due to stress, panic attacks, you know, was causing me just, I would come to and go out, right back out, come to, go right back out.

*               *               *

Q       How far do you walk normally, or now long do you walk with your dogs or your daughter or anything like that?

A       Usually, around the block a couple of times.

Q       And you do the cooking and cleaning and dishes, things like that in your home?

A       Well, my daughter helps out, and my mother helps out.  A lot of times, she cooks, and we go to her house for dinner.  I, when I do cook, it's simple meals.

Q       Do you do any cleaning or dishes or laundry?

A       Yes.  I do laundry, cleaning when I can get to it, you know, I just, depending on how I'm feeling that day, you know, is I try to do what I can.

Q       Do you get out to visit friends or relations?

A       Not really friends.  The most I see is my family.  We have, I have a real close-knit family, a large family.  We have a lot of family gatherings, and it's got to the point where anxiety, I even feel anxious going around my family where I, you know, I shouldn't feel that way at all.  And I've got there and had crying spells, Christmas Eve, for example.  Easter, I

didn't know if I was going to be able to make it down to my Mom's for, you know, Easter dinner, because I've had seizures, you know, in front of my family.  And I just feel like it's a downer, and I don't, you know, want to bring people down and ruin the holiday, and - -

Q	Do you, do people come over to visit you?

A	My family.

Q	Do you ever get out, go to church or a restaurant or a movie or anything like that?

A	Don't go out to eat.  Go to church on occasion with my Mom and Dad, the church that basically I grew up in a few blocks from my house.  And you know, I get real anxious, you know, being there.

Q	Ever go to like a movie or a club or a fraternal organization, anything like that?

A	No.

Q	Ever get out, go grocery shopping?

A	I go grocery shopping probably once every two weeks with my Mom and Dad.

Q	Do you have any hobbies or anything you still enjoy doing?

A	The Humane Society.

Q	I thought you said you hadn't done that in a while?

A	I hadn't done it in a while, but that's what I really, you know, enjoy doing, and I enjoy, you know, my animals and you know walking them, and their companionship along with my daughter's.  And when my daughter comes in from college, that always lifts my spirits, and to see her, and - -

Q	Yeah.  Do you do any gardening or lawn work or anything like that?

A	In the summer, my brother will bring over and plant a few tomato plants for me

that, you know, I'll care for, water. I do some light gardening.

Q        Who does the lawn and that kind of stuff?

A        My Dad. He keeps up on a riding lawn mower and cuts the grass.

Q        Do you ever get any exercise or anything like that?

A        Well, I'll exercise in my house. Sometimes, I know it sounds crazy, but I'll turn on music and dance by myself, and exercise or walk, you know, in the house.

Q        Do you watch TV a lot or read?

A        Magazines, I'll flip through magazines, but I really don't do a whole lot of reading. I - - what was the other question? Oh, I do television.

Q        Do you watch a lot of TV?

A        Not a lot of television. There's some shows that, you know, I like to watch with my youngest daughter. Like Sunday night, we watch Extreme Home Makeover, that's like our little date night, and we enjoy - -

Q        Uh-huh. Can you pretty much understand everything you see on TV?

A        Yeah. Now, sometimes in movies, if I watch it with my oldest daughter, you know, I'll be like, now, what's going on there, or what happened there, and she'll be like, Mom, and she'll explain it to me if I lose track of the plot, or - -

*          *          *

[EXAMINATION OF CLAIMANT BY ATTORNEY] (Tr. 320)

Q        Several times, when you were discussing the medication they used to try to treat or control the seizures, you said you could not tolerate them. Were you having severe side effects, or what was going on with those medications?

21

A       Severe side effects.  I can't remember, but the phenobarb, the Dilantin, one of them, I was at work and having double-vision.  One, like where they, I would have to go and have my blood checked.  It was like getting toxic, and they had to take me off of it.  One, I broke out in hives.  I just seem to be real sensitive to medications and - -

Q       Okay.  Are you having any side effects from the current medication Lyrica?

A       Fatigue.  I mean, it makes, anything that I think that slows down your brain activity, it just, you know, makes you feel like you're in a fog sometimes.

Q       Okay.  Now, you've had some recent EEGs.  They're essentially showing up normal.  Have your doctors explained to you why they feel you're having the seizures or why they're showing normal?

A       Well he explained to me that an EEG, that unless you're having a seizure right at that time of the EEG, it's going to come back normal, so it's not a real accurate test, you know.  As long as epilepsy has been around, there's, you know, there's still a lot they don't know about it.  And did you ask me why he thought that I was having - -

Q       Yes.

A       Stress, worried about, you know, stress is a contributing factor, worrying about how I'm going to take care of me and my daughter.  I mean, just, you know, basic things such as shelter and food and getting my medicines, and it's a big worry.

Q       And as far as the future, has your doctor given you a prognosis for the seizures, or told you what to expect?

A       Just keep trying different medications.

*          *          *

Q        Do you ever nap during the day?

A        Usually, every day, I lay down for approximately a half hour to an hour, probably before my daughter gets home from school, so I can kind of have the energy to help her with homework and address those issues.

Q        Okay.  Do you find that either condition, you're having problems with your ability to concentrate or your memory?

A        Definitely, I have a hard time concentrating.  Memory, I have to put notes up all the time to remind myself of, you know, the gas bill's due.  If I go to the grocery store without a list, I'm just standing there lost, you know, I don't even know what I came for, you know, I have to write everything down.

Q        Okay.  How long has that been the case?

A        Basically, since I started seizure medications.

\*        \*        \*

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]  (Tr. 326)

Q        Mr. Bell, could you please assess the claimant's past work as a cosmetologist by job title, exertional level, skill level, and any transferability of skills?

A        Yes, Your Honor.  The cosmetologist, according to the DOT, is light and skilled and it would not allow for any transferrable skills to sedentary.

Q        Okay.  Let me give you a hypothetical question.  If we assume a hypothetical person the same age, education, and work experience as the claimant, but assume there's no exertional limitation but the person should be no ladders, ropes, or scaffolds, and no more than occasional stairs or ramps, and no exposure to significant workplace hazards like heights or

dangerous moving machinery, and no driving or travel as part of the job, no fast-paced or assembly-line work, no close interaction with supervisors, no more than occasional changes in the work setting, no detailed or complex instructions, and no close concentration or attention to detail for an extended period of time, would there be any - - would such a person be able to do the job as a cosmetologist?

A        I don't believe so, Your Honor.

Q        Okay.  Would there be any other jobs such a person could do in say the, for example, the medium, light, or sedentary level?

A        Yes, I can give you an example out of each of those if you'd like, Your Honor.

Q        Please.

A        Okay.  At the medium level, laundry worker, medium, 375,000 nationally, 2,300 regionally; at the light level, office assistant, light, 150,000 nationally, 1,850 regionally; and at the sedentary, general office clerk, 299,000 nationally, 2,900 regionally.

*                    *                    *

Q        Okay.  Is your testimony consistent with the DOT?

A        I believe it is, Your Honor.

Q        And how many days, if any, can a person miss work and still do these kinds of jobs?

A        If you're going to miss more than two days, I believe that they would attempt to have that corrected and if not remedied, would result in termination.

Q        And that's two days a month?

A        Correct.

24

Q    Okay.

*         *         *

[EXAMINATION OF VOCATIONAL EXPERT BY REPRESENTATIVE] (Tr. 327)

Q    I would just like to ask you, due to the seizure disorder and side effects of medication, if a person would be off task a total of one hour outside of any normal scheduled breaks, how would that impact the jobs you had mentioned, or any other jobs?

A    I don't believe that would allow for a competitive work routine.

*         *         *

E.    Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

• Tries to make dinner. (Tr. 103)

• Helps her twelve-year-old daughter with her homework. (Tr. 103)

• Watches TV and tries to read. (Tr. 103)

• Feeds and brushes pets. (Tr. 104)

• Prepares sandwiches and meals with several courses with husband's help. (Tr. 105)

• Prepares meals a couple of times per week. (Tr. 105, 132)

• Cleans house on a weekly basis with help of husband and daughter. (Tr. 105)

• Does laundry every other day with help of husband and daughter. (Tr.. 105)

• Waters flowers on a weekly basis with help of husband and daughter. (Tr. 105)

• Goes outside 2 to 3 times per day for about 15 minutes. (Tr. 106)

- Shops at store for food, toiletries, and household goods twice a week for an hour.  (Tr. 106)

- Unable to drive herself due to risk of seizures.  (Tr. 106)

- Pays bills, counts change, uses a checkbook/money order.  (Tr. 106)

- Watches TV daily.  (Tr. 107)

- Walks dogs once per month.  (Tr. 107)

- Plants flowers annually.  (Tr. 107)

- Goes to the Humane Society twice per month.  (Tr. 107)

- Visits parents' home every other day.  (Tr. 107)

- Talks with others on the phone, at home, on computer and at parents' home every other day.  (Tr. 107)

- Can walk about a block before needing to stop and rest.  (Tr. 108)

- Works as a cosmetologist one day per week for one to four hours.[6]  (Tr. 302)

- Cuts, colors, and perms hair as a cosmetologist.  (Tr 302)

- Takes dogs to neighborhood park.  (Tr. 316)

- Walks around the block a couple of times.  (Tr. 316)

- Attends church on occasion with mother and father.  (Tr. 317)

- Goes grocery shopping once every two weeks with mother and father.  (Tr. 317)

- Flips through magazines.  (Tr. 318)

- Watches TV with daughter on Sunday night.  (Tr. 318)

---

[6] The ALJ concluded Claimant's work as a cosmetologist did not rise to the level of substantial gainful activity.  (Tr. 21).

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant alleges the ALJ 1) erroneously considered an outdated version of Listings 11.02 and 11.03, 2) misstated the requirements of SSR 87-6 in relation to Listings 11.02 and 11.03, 3) failed to properly evaluate the "B" criteria of Listings 12.04 and 12.06, 4) erroneously rejected every medical opinion favorable to Claimant; 5) erroneously failed to include all Claimant's limitations in her RFC and the hypothetical to the VE, and 6) failed to properly evaluate Claimant's credibility. Commissioner responds 1) Claimant did not meet or equal the requirements of the revised Listings 11.02 and 11.03, 2) Claimant did not meet or equal Listings 11.02 or 11.03, 3) the ALJ properly evaluated the "B" criteria of Listings 12.04 and 12.06, 4) the ALJ properly evaluated and weighed the medical opinions, 5) the ALJ properly included in the RFC and hypothetical Claimant's limitations supported by the record, and 6) the ALJ properly determined Claimant's credibility.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 569(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

       2.      <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u>, 42 U.S.C. §§ 405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

       3.      <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. §§ 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

       4.      <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

       5.      <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

       6.      <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the

Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion

    1.    Whether the ALJ Erred By Considering an Outdated Version of Listings 11.02
    and 11.03.

Claimant alleges the ALJ erred in his analysis because he considered an outdated version

of Listings 11.02 and 11.03 during step three of the sequential analysis.  Commissioner contends

there is no evidence Claimant meets the criteria of the revised Listings 11.02 and 11.03.

At step three of the sequential analysis, the ALJ must determine whether any of a

claimant's impairments meet or equal the impairments listed in 20 C.F.R. pt. 404, subpt. P, app.

1;  SSR 86-6.  A finding that a claimant's impairment meets or equals a Listing in Appendix 1

results in a determination of disability without the need for further review, because the

impairments listed in Appendix 1 "would ordinarily prevent an individual from engaging in any

gainful activity."  Id.  The claimant bears the burden of proving that their impairment meets all,

not merely some, of the requirements of a listed impairment.  Fleming v. Barnhart, 284 F. Supp.

2d 256, 269 (D.Md. 2003); see, also, Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).  In

order for the reviewing court to determine if the Secretary based the agency's decision on

substantial evidence, the ALJ's decision must include the reasons for the determination that an

impairment does not meet a listed impairment.  Cooks v. Heckler, 783 F.2d 1168, 1172 (4th Cir.

1986).  The Court must "uphold the factual findings of the Secretary if they are supported by

substantial evidence and were reached through application of the correct legal standard."  Craig,

76 F.3d at 589; see, also, 42 U.S.C. § 405(g).

The Court finds the ALJ applied an incorrect legal standard in the third step, namely the

outdated requirement of Listings 11.02 and 11.03 that Claimant provide evidence of a positive

EEG.  Effective May 24, 2002, Listing 11.02 and 11.03 no longer required "an EEG be part of

the documentation needed to support the presence of epilepsy" because "it is rare for an EEG to confirm epilepsy in its other forms for either adults or children." <u>See</u> 67 F.R. 20018, *20019. The revised Listing 11.02 now requires documentation of "detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment" with daytime episodes or nocturnal episodes "manifesting residuals which interfere significantly with activity during the day." 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.02. The revised Listing 11.03 now requires "detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment." Id. at § 11.03.

Despite the above revisions to the Listings, the ALJ in the present case stated, "[i]n regards to her seizure disorder, the claimant does not meet or equal Listings 11.02 or 11.03, as interpreted by SSR 87-6. The claimant has had no positive EEGs. More importantly, no specialist has explained why the claimant continues to have seizures in spite of prescribed treatment and medication, as required by SSR 87-6. The undersigned believes that there is a very big question as to whether the claimant has real seizures at all." (Tr. 22). Although it appears the ALJ relied on criteria from both the outdated and revised Listings, and although it is possible the ALJ did not intentionally reference the outdated Listings but was merely noting the absence of positive EEGs in the record, the Court cannot ensure the ALJ employed the proper standards without further clarification from the ALJ. <u>See</u> <u>Craig</u>, 76 F.3d at 589. Accordingly, the case must be remanded for evaluation of the Listings using the revised standards.

      2.    <u>Whether the ALJ Erred In His Application of SSR 87-6 in Step Three of the Sequential Analysis</u>.

Claimant argues the ALJ failed to comply with SSR 87-6 when evaluating Listings 11.02 and 11.03 because he failed to contact her treating physician, Dr. Alghadban, for additional information regarding claimant's seizures. Commissioner responds to Claimant's argument only in so far as contending Claimant did not meet the criteria for epilepsy or Listings 11.02 or 11.03.

SSR 87-6 governs the role of prescribed treatment in the evaluation of a claimant's epilepsy. SSR 87-6. It explains that advances in modern medicine render only a small percentage of epileptics unable to engage in substantial gainful activity. Id. Consequently, "situations where seizures are not under good control are usually due to the individual's noncompliance with the prescribed treatment rather than the ineffectiveness of the treatment itself." Id. To ensure a claimant's frequent seizures result from "factors beyond that individual's control" versus "noncompliance with prescribed therapy," the ALJ must look for detailed information in the record documenting the claimant's treatment regimen and compliance with it. Id. It may be necessary to recontact the treating medical source if the information is not in the record. Id.

The Court disagrees with Claimant and finds the ALJ did not have a duty to recontact Claimant's treating physicians because the record clearly details Claimant's treatment regimen and compliance with it. Specifically, the record documents Claimant's first episode and treatment in Atlanta in 1999. (Tr. 151). It then documents Claimant's visit to Dr. Navada in May 2004 due to complaints of "tremulousness of her arms" and episodes of confusion. (Tr. 151). Dr. Navada noted that Claimant was originally prescribed Dilantin and Phenobarbital in 1999, was then switched to Neurontin, and was presently prescribed Neurontin, Lorazepam, Allegra and Effexor, but was not taking the Lorazepam. (Tr. 151). Dr. Navada increased

Claimant's dosage of Neurontin. (Tr. 151). The record then documents Claimant's admission to United Hospital in March 2005 after reports of unresponsiveness in prior days coinciding with her stopping her Trileptal. (Tr. 261). Dr. Alghadban continued Claimant on Neurontin, switched her Ativan to Xanax, and switched her Effexor to Lexapro. (Tr. 161). The record then continues to document Claimant's repeated visits to Dr. Alghadban from March 2005 through February 2006. Finally, the record documents Dr. Alghadban's conclusion that Claimant's seizures are largely related to stress. (Tr. 227, 261-62). The Court finds the record clearly documents Claimant's treatment regimen and compliance such that Claimant's doctor did not need to be contacted by the ALJ. The Court so finds despite recognizing the record fails to precisely explain why Claimant continues to experience seizures.

3.  Whether the ALJ Erred by Failing to Properly Consider the "B" Criteria of Listings 12.04 and 12.06.

Claimant alleges the ALJ erred in evaluating whether Claimant met or equaled Listing 12.04 and 12.06 because the ALJ improperly concluded she suffered from only "moderate" difficulty maintaining concentration, persistence or pace, as opposed to being "severely deficient" in the area of concentration. Commissioner responds that the ALJ's determination was consistent with the state agency medical assessments.

In step three of the sequential analysis, the ALJ must determine whether any of a claimant's impairments meet or equal the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1. SSR 86-6. For Listings 12.04 and 12.06, the claimant bears the burden of proving at least two of the following "B" criteria: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner; repeated episodes of deterioration or

decompensation."  20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04, 1206.

The Court finds that although evidence suggests Claimant was only "moderately" limited in concentration,[7] the ALJ's reasons for rejecting Ms. Allman's and Dr. McClure's opinions are not supported by substantial evidence.  Ms. Allman concluded Claimant's  concentration was "severely deficient."  (Tr. 197).  Similarly, Dr. McClure, Claimant's treating physician for her depression and panic disorder, concluded Claimant suffered from "poor concentration" and was "markedly limited" in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, and complete a normal work-day and work-week.  (Tr. 197, 236, 276).  The ALJ rejected Ms. Allman's opinion because she failed to specify "functional limitations" and rejected Dr. McClure's opinion because he provided an opinion on issues reserved to the Commissioner, namely whether Claimant was capable of working.  (Tr. 26).  These reasons do not justify  the ALJ's rejection of their opinions, because Ms. Allman was under no duty to specify "functional limitations" and Dr. McClure's entire opinion should not have been disregarded merely because a portion of his opinion extended into an area reserved to the Commissioner.  Accordingly, the case must be remanded for reconsideration of Ms. Allman's and Dr. McClure's opinions.

4.    Whether the ALJ Erred by Rejecting Opinions Favorable to Claimant.

Claimant alleges the ALJ improperly rejected medical opinions favorable to Claimant, specifically those of Dr. McClure, Peggy Allman, and Dr. Alghadban.  Commissioner argues the

---

[7] Dr. Navada concluded Claimant's concentration was normal.  (Tr. 151).  Dr. Comer, a state evaluating physician, concluded Claimant was only "moderately" limited in her ability maintain concentration, persistence or pace.  Furthermore, Claimant retained the concentration necessary to  cook, clean, watch television,  read magazines, drive, pay bills, help her daughter with homework, and work as a cosmetologist.  (Tr. 103, 106, 151, 200, 214, 302).

ALJ properly weighed and evaluated the medical opinions in the record.

A treating physician's opinion will be entitled to controlling weight under some circumstances. The opinion must be (1) well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.972(d)(2). A treating physician's opinion will be disregarded if persuasive contrary evidence exists. Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). An ALJ may rely on the opinions of non-examining physicians, even when those opinions contradict the opinion of a treating physician, if the opinions are consistent with the record. Gordon, 725 F.2d at 235. Regardless of a physician's opinion, the ultimate legal determination of Claimant's impairments remains with the Commissioner. 20 C.F.R. § 404.1527(d)(2); (e)(2); McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ's findings will be upheld as long as substantial evidence supports them. Hays, 907 F.2d at 1456.

Regarding the ALJ's rejection of Dr. McClure's opinion Claimant was "markedly limited" in areas of concentration, the Court finds the ALJ's rejection is not supported by substantial evidence. (Tr. 197, 236, 276). As explained above, the ALJ rejected Dr. McClure's opinion because Dr. McClure provided an opinion on Claimant's ability to work, an issue reserved for the Commissioner. (Tr. 26). The Court finds the ALJ's rejection on that basis is not supported by substantial evidence and the case must be remanded for further consideration of Dr. McClure's opinion despite the fact he provided an opinion on an issue reserved for the Commissioner.

Regarding the ALJ's rejection of Ms. Allman's opinion that Claimant's concentration was "severely deficient," the Court finds, as it did above, the ALJ's rejection is not supported by

substantial evidence. The ALJ rejected Ms. Allman's opinion because she failed to specify "functional limitations" arising from Claimant's deficiency. (Tr. 26). Rejection of her entire opinion on that basis is not supported by substantial evidence. Accordingly, the case must be remanded for further consideration of Ms. Allman's opinion.

Regarding the ALJ's rejection of Dr. Alghadban's opinion Claimant is unable to work, the Court finds the ALJ's conclusion is not supported by substantial evidence. Dr. Alghadban treated Claimant from March 2005 through February 2006. In February 2006, Dr. Alghadban concluded Claimant "cannot handle work at this time, given her seizure and depression conditions." (Tr. 226). The ALJ rejected Dr. Alghadban's opinion because Dr. Alghadban concluded Claimant was having pseudoseizures, that her seizures were induced by stress in her personal life as opposed to the work-environment, and because Dr. Alghadban "gives no rationale as to why her seizures should not be controllable by seizure medications." (Tr. 26). Although the record does fail to document the presence of abnormal brain activity suggestive of seizures or epilepsy, the record documents Claimant continues to have seizures, Dr. Alghadban continued to prescribe seizure medication to Claimant and also contains detailed testimony from Claimant and family members documenting the severity of Claimant's seizures. (Tr. 99, 112, 125). Additionally, Dr. McClure concluded in February 2006 Claimant was unable to work for the next 18 to 24 months due to poor concentration, poor energy, emotional lability, and agoraphobia. (Tr. 236). In light of the above evidence, there is not substantial support for the ALJ's dismissal of Dr. Alghadban's conclusion and the case must be remanded for further consideration of Dr. Alghadban's opinion in light of the above evidence.

     5.      <u>Whether the ALJ Failed to Include All Claimant's Limitations in Her RFC and Hypothetical to the Vocational Expert</u>.

Claimant alleges the ALJ failed to include in her RFC limitations caused by her seizure disorder and failed to include in the hypothetical to the Vocational Expert her "severely deficient concentration." Commissioner responds Claimant's RFC and the hypothetical to the VE properly included those limitations supported by the record.

At step four of the sequential analysis, the ALJ must determine the claimant's RFC. 20 C.F.R § 404.1520. The RFC is what a claimant can still do despite her limitations. Id. at § 404.1545. More specifically, it is an assessment of a claimant's functional limitations resulting from medically determinable impairments (or combination of impairments) and includes the impact of related symptoms such as pain. SSR 96-8p (1996). The determination of a claimant's RFC is based upon all of the relevant evidence. 20 C.F.R. § 404.1545. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps a claimant from performing particular work activities. Id.

During step five of the sequential analysis, the ALJ is responsible for reasonably setting forth all of Claimant's impairments in the hypothetical posed to the VE. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989); SSR 96-5p (1996). In other words, the hypothetical must "adequately reflected" a persons's impairments. Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005). However, the ALJ's hypothetical need only include those limitations supported by the record. Id. The limitations and impairments included in the hypothetical should reflect the Claimant's RFC. 20 C.F.R. § 404.1545, SSR 96-8p.

The ALJ in the present case determined Claimant had a RFC to "perform work with no

exertional limitations; no climbing of ladders, ropes or scaffolds; no more than occasional climbing of stairs and ramps; no exposure to significant workplace hazards including unprotected heights or dangerous moving machinery; no driving or travel as part of the job; no fast paced or assembly line work; no detailed or complex instructions; no close concentration or attention to detail for extended periods; no close interaction with supervisors; no more than occasional changes in the work setting; and the work must allow the claimant to miss up to one day of work per month." (Tr. 23).

The ALJ then posed the following hypothetical to the VE: "If we assume a hypothetical person the same, education, and work experience as the claimant, but assume there's no exertional limitation but the person should be no ladders, ropes or scaffolds and no more than occasional stairs and ramps, and no exposure to significant workplace hazards like heights or dangerous moving machinery, and no driving or travel as part of the job, no fast paced or assembly line work, no closer interaction with supervisors, no more than occasional changes in the work setting, no detailed or complex instructions, and no close concentration of attention to detail for an extended period of time, would there be any - - would such a person be able to do the job as a cosmetologist?" (Tr. 326). The VE replied that such an individual would be unable to work as a cosmetologist but would be able to work as a laundry workers, office assistant, and office clerk. (Tr. 326-27). The VE replied that the jobs would be unavailable if the individual had to miss more than two days of work per month. (Tr. 327).

The Court finds Claimant's RFC and the hypothetical to the VE did not sufficiently account for Claimant's limitations arising from her seizures. As evidenced above, the RFC and hypothetical provide for Claimant missing one day of work per month. However, the record

suggests Claimant may need to miss <u>more</u> than one day of work per month. Claimant testified she experiences one to two grand mal seizures per month, a partial seizure weekly, and focal seizures daily. (Tr. 304-05). Additionally, multiple friends and family testified to witnessing Claimant's seizures and Dr. Alghadban believed Claimant's seizures rendered her unable to work. (Tr. 99, 112, 125, 226). Finally, the ALJ himself concluded Claimant's seizures, in combination with depressive and anxiety disorder, were severe. (Tr. 21). Accordingly, the case must be remanded for further consideration of Claimant's RFC in light of the above evidence.

Regarding the issue of whether Claimant's RFC and the hypothetical to the VE sufficiently account for her concentration deficiencies, the Court finds both are not supported by substantial evidence only because the ALJ's rejection of Ms. Allman's and Dr. McClure's opinion is not supported by substantial evidence. The case is remanded for the ALJ's reconsideration of Claimant's RFC and the hypothetical posed to the VE in light of his reconsideration of Ms. Allman's and Dr. McClure's opinions.

      6.    <u>Whether the ALJ Failed to Properly Evaluate Claimant's Credibility</u>.

Claimant alleges the ALJ failed to properly evaluate Claimant's credibility because he supplanted his own opinions for the two-part test outlined in <u>Craig</u>, 76 F.3d at 585. Commissioner argues the ALJ properly evaluated Claimant's credibility.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in <u>Craig</u>, 76 F.3d at 585. Under <u>Craig</u>, when a claimant alleges disability from subjective symptoms, she must first show the existence of a medically determinable impairment that could cause the symptoms alleged. <u>Id.</u> at 594. The ALJ must "expressly consider" whether a claimant has such an impairment. <u>Id.</u> at 596. If the claimant makes this showing, the ALJ must consider

all evidence, including the claimant's statements about her symptoms, in determining whether the claimant is disabled.  Id. at 595.  While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged.  Id.  If the ALJ does choose to discredit a claimant's statement, the ALJ must explain his reason for doing so.  SSR 96-7p.

The Court finds the ALJ's discredit of Claimant's statements as to the severity and frequency of her seizures is not supported by substantial evidence.  The ALJ in the present case concluded, "[a]fter considering the evidence of the record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible."  (Tr. 26).  In coming to his conclusion, the ALJ relied on Claimant's lifestyle evidence, the absence of abnormal brain images in the record, and Dr. Alghadban's conclusions Claimant was experiencing pseudoseizures and that they were induced by stress.  (Tr. 26).  The Court finds the ALJ's conclusion is not supported by substantial evidence because he failed to consider statements from Claimant's friends and family members as to the severity of her seizures (see 20 C.F.R. § 404.1513(d)(4)), and improperly discredited Dr. Alghadban's opinion Claimant's seizures rendered her unable to work.  (Tr. 99, 112, 125, 226).  Additionally, the ALJ impermissibly substituted his own judgment for that of a physician by concluding, without any support in the medical record, "CT scans do not show seizures" and "EEGs may show the possibility of epileptiform activity."  (Tr. 26); see Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982).

Accordingly, the Court finds the case must be remanded for further consideration of Claimant's credibility in light of above findings and evidence.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be GRANTED because the Court cannot determine whether the ALJ employed the proper legal standard during step three of the analysis. Additionally, the Court finds the ALJ's reasons for rejecting Ms. Allmans', Dr. McClure's, and Dr. Alghadban's opinions are not supported by substantial evidence. Finally, the Court finds the ALJ's reasons for discrediting the severity and frequency of Claimant's seizures are not supported by substantial evidence.

2.      Commissioner's Motion for Summary Judgment be DENIED for the same reasons stated above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: November 19, 2007

/s/ James E. Seibert
JAMES E. SEIBERT

41

UNITED STATES MAGISTRATE JUDGE